UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MARLIN L. WALKER,           )
           )
      Plaintiff,       )
           )
   vs.           )      Case No. 4:14-CV-765-CEJ
           )
CAROLYN W. COLVIN, Acting   )
Commissioner of Social Security,  )
           )
      Defendant.    )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I.    Procedural History

On June 12, 2006, plaintiff Marlin L. Walker filed applications for disability insurance benefits, Title II, 42 U.S.C. §§ 401, *et seq.*, and supplemental security income, Title XVI, 42 U.S.C. §§ 1381, *et seq.*, with an alleged onset date of January 31, 2005.  (Tr. 64–66)  After plaintiff's application was denied on initial consideration (Tr. 41–45), he requested a hearing from an Administrative Law Judge (ALJ).  (Tr. 46–47)  Plaintiff and counsel appeared for a hearing on March 13, 2008.  (Tr. 22–37)  The ALJ issued a decision denying plaintiff's application on May 22, 2008.  (Tr. 7–18)  Plaintiff requested the Appeals Council reverse the ALJ's decision and remand for a new hearing.  (Tr. 6)  The Appeals Council denied plaintiff's request for review on April 21, 2010.  (Tr. 1–3)

Plaintiff then appealed the ALJ's decision to this Court, which the Court reversed and remanded on January 31, 2011, at the request of the parties, for further consideration of plaintiff's claim.  (Tr. 320)  A different ALJ held a second

hearing on June 15, 2011, at which plaintiff and counsel again appeared. (Tr. 288–301) The ALJ issued a decision again denying plaintiff's application on July 21, 2011. (Tr. 261–75) Plaintiff requested the Appeals Council reverse the ALJ's decision and remand for a new hearing. (Tr. 280–81) The Appeals Council denied plaintiff's request for review on March 15, 2014. (Tr. 258–60) Accordingly, the ALJ's July 21, 2011, decision stands as the Commissioner's final decision.

## II. Evidence Before the ALJ

### A. Disability Application Documents

Plaintiff was born on August 13, 1970. (Tr. 64) He is single, but he claimed two dependents in his disability application, and the Department of Veterans Affairs (VA) acknowledged the birth of a third dependent after his alleged onset date. (Tr. 64, 65, 81) He served in the United States Army from December 27, 1989 until December 16, 1992. (Tr. 64) Plaintiff graduated from high school, where he attended regular education classes.[1] (Tr. 95) He can understand, read, and write English. (Tr. 90) Plaintiff was living with his mother as of June 12, 2006; he received food stamps. (Tr. 71)

An earnings report generated by the Social Security Administration shows that from 1987 to 2005, plaintiff earned no income in four years, he earned less than $10,000 in nine years, and he never earned more than $24,000 in any year. (Tr. 73) His earnings from income in his last year of work were only $2,985. *Id.* Plaintiff claimed that he received approximately $430.00 per month in veteran's

---

[1]Some evidence before the ALJ indicated plaintiff has several non-severe mental impairments. (Tr. 267–68) The ALJ found plaintiff's mental impairments, alone and in combination, were non-severe. *Id.* Because plaintiff does not contest the ALJ's findings of fact and conclusions of law with regard to plaintiff's mental conditions, the Court will only discuss evidence pertinent to plaintiff's physical condition and alleged impairments.

benefits as of his application date—the VA's records indicate that his benefits increased to $1,503.00 per month on April 1, 2007, and that he is presently receiving $1,192.00 per month. (Tr. 70, 81)

Plaintiff last worked in January 2005. (Tr. 97) In his Disability Report (Tr. 86–96), plaintiff listed his disabling conditions as post-traumatic stress disorder (PTSD), "major depression," "memory loss," and degenerative disc disease of the lumbar spine. (Tr. 90) Plaintiff stated that he has "chronic pain in [his] back from ruptured discs" and that he has "trouble remembering things." *Id.* He claimed that his symptoms first began in 1992, but he admitted that he worked after his symptoms began—he claims he only became unable to work due to his conditions on January 31, 2005. (Tr. 91) Plaintiff reported that he stopped working because he "was awarded non-service connected VA disability benefits," and that he "only worked during the waiting period because [he] had to in order to pay the bills," averring that he only worked "part time." *Id.*

Plaintiff reported that he worked as a janitor "off and on" from 1992 until 2005. This job entailed cleaning apartments, including cleaning appliances, walls, and carpets; and removing trash. (Tr. 91–92) As a janitor, plaintiff worked an eight-hour day, five days a week; the work involved walking, standing, and climbing for up to seven hours a day. (*Id.*) Plaintiff also was required to lift cleaning equipment, including carrying vacuum cleaners, old carpets, mattresses, and other items "up and down 3 to 4 flights of stairs." *Id.* Plaintiff reported that he would sometimes lift up to fifty pounds, and he frequently was required to lift up to ten pounds. *Id.*

Plaintiff reported that he has been seen on an outpatient basis at the VA medical center from 1992 onward, where he received psychiatric treatment and "shots in [his] back for pain." (Tr. 93) He also recalled being prescribed 800 mg of Ibuprofen and unspecified "muscle relaxers" for his back pain, neither of which caused any side effects. (Tr. 94) Plaintiff claimed that he is "totally depressed" and that he thinks about "committing suicide, because [of] the pain [he is] in is sometimes unbearable." (Tr. 104) He claimed that he can "hardly eat" because his appetite is poor. *Id.* His weight was approximately 185 pounds. (Tr. 90)

Plaintiff asserted that he "can't do much of anything, so [he] go[es] and lie[s] back down" after getting up. (Tr. 104) Though he stated that he can no longer play sports or work, he remained able to dress, bathe, and feed himself without difficulty; his lower back hurts when he uses the toilet. (Tr. 105) He reported that he does not prepare his own meals or perform any household chores. (Tr. 106) He reported that he drives a car, though he does not do any shopping. (Tr. 107) Plaintiff stated that he has no hobbies or social activities. (Tr. 108)

Plaintiff claims that his back pain and other illnesses affect his ability to concentrate, understand, climb stairs, lift, squat, and bend. He did not report any difficulty standing, sitting, following instructions, or using his hands. (Tr. 109) Although plaintiff also did not report any difficulty with walking, he claimed he was able to walk only ten feet before needing to rest for twenty minutes. *Id.* Plaintiff did not ambulate with any assistive device. (Tr. 109–10). Plaintiff stated he had been fired from a job because he "couldn't focus;" he did not attribute his discharge to any mobility limitations. (Tr. 110)

Brenda Wade, plaintiff's aunt, completed a Function Report. She did not respond to the question regarding the amount of time she spent with plaintiff, but she wrote, "we don't do anything together." (Tr. 112) Nevertheless, she responded to questions about plaintiff's daily activities and the effects of his impairments. (Tr. 112–20)

In a Disability Report Appeal completed on August 17, 2006, plaintiff claimed that he was living with his mother and that his conditions had worsened since his previous report. (Tr. 123, 129) Specifically, plaintiff stated that: "I went into a deeper depression," and his back pain was "worse." (Tr. 123) Plaintiff recalled seeing Dr. Bhalodia at the VA Medical Center on May 10, 2006, for what he described as, "severe throbbing back pains," such that he "couldn't lift [him]self out of bed." (Tr. 124) He was given "a shot in the back and ibuprofen," as well as "codeine for pain." *Id.* Plaintiff states that he was prescribed 600 mg of ibuprofen and 300 mg of combined codeine and acetaminophen for "severe pain." (Tr. 126) On an additional Disability Report Appeal form, plaintiff recalled taking 800 mg of ibuprofen, combined codeine and Tylenol (acetaminophen), and unspecified muscle relaxers, for back pain. (Tr. 135) Plaintiff stated that his conditions affect his ability to "take care of [his] personal needs because [he] stay[s] so depressed." (Tr. 127)

Plaintiff's self-reported work history is sporadic. (Tr. 139) From 1989 to 1992 he served in the United States Army as a tank driver. *Id.* From 1995 to 1997 he was a temporary assembly line worker in an automobile plant. *Id.* He worked again from 1998 to 1999 as an airport custodian. *Id.* Finally, he reported that he was a janitor for an apartment complex from June 2004 to March 2005, and that he

was a laborer for a construction company, rehabbing houses, hanging drywall, painting, and cleaning up construction sites from 1999 until an unspecified time in 2005. (Tr. 139, 386)

At one point, plaintiff listed his medications as 10 mg of Cyclobenzaprine,[2] 30 mg of codeine, 500 mg of Naproxen,[3] and an unspecified dose of Demerol (Meperidine),[4] all for knee and back pain. (Tr. 141) He also reported taking over-the-counter extra-strength Tylenol for back and knee pain. *Id.*

## B. Testimony at the First Hearing

On March 13, 2008, an ALJ held a hearing, which plaintiff and his counsel attended. (Tr. 22–37) That ALJ noted that plaintiff was receiving non-service connected pension benefits from the VA. (Tr. 26) Plaintiff testified that he has lived with his parents since he was discharged from the military in 1992. (Tr. 27) He recalled having completed the twelfth grade and having been enrolled in regular education classes. *Id.*

Plaintiff testified that he is prevented from working because of his lower back and his right knee. (Tr. 29) He stated that, "it seem[s] like if I sit down or stand up, like for a[n] hour, like I feel pains going down my—like pinching nerves or something going down my left leg on the side of my right leg." *Id.* Plaintiff

---

[2]**Error! Main Document Only.**Cyclobenzaprine is a skeletal muscle relaxant which relieves muscle spasm of local origin without interfering with muscle function. *See Phys. Desk Ref.* 1481 (64th ed. 2010).

[3]**Error! Main Document Only.**Naproxen is the generic name for Naprosyn, a nonsteroidal anti-inflammatory drug used for relief of the signs and symptoms of tendonitis and pain management. *See Phys. Desk Ref.* 2769–70 (60th ed. 2006).

[4]"Meperidine is used to relieve moderate to severe pain. Meperidine is in a class of medications called narcotic analgesics, a group of pain medications similar to morphine. It works by changing the way the body senses pain." http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682117.html (last visited July 6, 2015).

testified that he had been suffering from painful condition for "five to six years," and that he was receiving treatment for it at the VA hospital. *Id.*

Plaintiff testified that, other than sitting and standing, no other activities affect the pain in his lower back or right leg. *Id.* He also testified that bending "sometimes" exacerbates his condition. *Id.* He also testified that his knee would hurt if he had to kneel or crouch, though not his back. *Id.* He testified that reaching in front of him would not cause him back pain, but reaching overhead would "sometimes" cause him lower back pain. (Tr. 30)

According to plaintiff, walking does not increase his back pain, though lifting items does. *Id.* Plaintiff admitted being able to sit or stand for an hour at a time. He also said that he lays down "as much as possible" during the day "because [he] just [doesn't] feel like going [any]where." *Id.* Plaintiff testified that lying down does not decrease the pain in his back, nor does any other activity. (Tr. 31) He had declined the offer of surgery for his back condition because he was "scared a little," after having seen the negative results of his father's back surgeries. *Id.*

Plaintiff testified that if he bends his right knee it will "pop," causing him pain. (Tr. 31–32) Plaintiff estimated that he can only walk a distance of eight feet because of his knee condition. (Tr. 32) When his knee begins to hurt, he sits down to "exercise it a little bit" for ten to fifteen minutes. (Tr. 33) Despite having testified that he can stand for up to an hour (Tr. 29), plaintiff later testified that, because of his knee condition, he could only stand for "like 10 minutes." (Tr. 33) Plaintiff stated that he was not being treated for any conditions other than back and knee pain,. (Tr. 34) Since his pain began, he has continued to do chores around the house such as sweeping, mopping, cleaning the bathroom, and washing dishes,

none of which are affected by his conditions. (Tr. 35–36) Plaintiff said that he sleeps between five and six hours per night; he does not nap during the day. (Tr. 36) He testified that his back pain is worse than his knee pain. (Tr. 36–37)

### C. Testimony at the Second Hearing

After the Court reversed and remanded the case at the request of the parties, the ALJ held a second hearing on June 15, 2011, at which plaintiff and counsel again appeared. (Tr. 286–301) At the time of the second hearing, plaintiff was 40 years old. (Tr. 288) Plaintiff testified that he served as a tank driver in the United States Army, and he was honorably discharged in 1992. (Tr. 289) Though plaintiff had some criminal history (Tr. 289–90), the ALJ gave little weight to that history in rendering his decision. (Tr. 272–73) Plaintiff also indicated past alcohol and drug use, with the last occurrence in 2009 (Tr. 292–93); the ALJ did not consider plaintiff's substance abuse a factor material to the determination of disability, because the ALJ found plaintiff not disabled. (Tr. 274)

Plaintiff testified that in his past janitorial and custodial work, he would lift between 75 and 100 pounds. (Tr. 290) He further testified that he had not worked since 2005, when his previous employer "laid [him] off" and then the VA awarded him non-service related disability benefits. (Tr. 291) According to plaintiff, the VA informed him that he could not work while accruing disability benefits, though without providing specific restrictions that plaintiff could recall. (Tr. 292)

Plaintiff testified that he had been offered and had rejected surgery for his right knee. (Tr. 294) He again claimed to suffer from lower back pain and leg pain. (Tr. 295) He testified that his ability to walk, stand, and sit is affected by those conditions. *Id.* He claimed that his conditions are exacerbated if he sits for 30

minutes, such that his right leg will go numb about 60% of the time.  *Id.*  He also said that his lower back begins to throb if he stands for more than 40 minutes.  *Id.*  Plaintiff testified that he spends approximately 50% of his day lying down.  (Tr. 296)  He also testified that he can walk for up to an hour, at which point his right leg will go numb, affecting his balance.  *Id.*  Plaintiff then testified that he was taking ibuprofen and Cyclobenzaprine, which make him sleepy.  *Id.*

Plaintiff recalled that he suffered a "bruised" right knee bone in 2006 or 2007.  (Tr. 297)  Though he testified that his knee condition causes him difficulty while walking, plaintiff did not report using a knee brace, cane, or other assistive device to alleviate his pain.  *Id.*

Delores Gonzales, a vocational expert, provided testimony regarding the employment opportunities for an individual of plaintiff's age, education, and past relevant work who retains the capacity to lift and carry 20 pounds occasionally, 10 pounds frequently, and who requires a sit/stand option; who can occasionally climb stairs and ramps, can never climb ropes, ladders, or scaffolds, can occasionally stoop, kneel, crouch, and crawl; and who should avoid concentrated exposure to vibration and the hazards of unprotected heights.  (Tr. 298–99)  Gonzalez testified that given those restrictions, such a person would not be able to perform plaintiff's past relevant work.  (Tr. 299)  However, Gonzalez testified that with that RFC, such a person could work in other jobs that exist in significant numbers in the national economy.  *Id.*  Gonzalez testified that examples of such jobs would include working as an order caller or a mail clerk.  *Id.*

The ALJ asked Gonzalez if her testimony was consistent with the Dictionary of Occupational Titles with the exception of the sit/stand option proposed, "which is

not covered by that publication." (Tr. 300)  Gonzalez testified that her testimony was so consistent.  *Id.*  Counsel then inquired whether a person with those limitations would be able to work if the individual needed to lie down during the day.  *Id.*  The vocational expert testified that such a person would not be able to work, unless that person was able to lie down at lunch time.  *Id.*  Counsel did not follow up with additional questions on that subject.  *Id.*

### D.  Medical Records

### 1.  Pre-Application Records

On August 23, 2004, plaintiff was seen at a primary care clinic.  (Tr. 177)  At that time, he was taking 10 mg of Cyclobenzaprine and 600 mg of Oxaprozin.[5]  *Id.* Plaintiff's straight leg raise test was negative for abnormalities, and he had no spine deformity or tenderness, with a full range of motion except for lateral flexion to the right.  *Id.*  Dr. Rajesh Nair and Dr. Cory Fitch examined plaintiff.  (Tr. 178–79)  Dr. Fitch noted that:  "patient is doing well except for his back which apparently does not hurt much of the time.  Nevertheless, he continues to take one or two Flexeril (Cyclobenzaprine) tabs daily.  I advised him to discontinue the Flexeril.  He does not want back surgery."  (Tr. 179)

On May 2, 2005, plaintiff was seen at a walk-in clinic, where he complained of back pain, radiating to his right leg.  (Tr. 174)  Plaintiff complained that he can "barely get out of bed, or stand," and that the "numbness in [his] legs seems to be worsening."  (Tr. 207)  He stated that the ibuprofen he had been taking had not relieved his pain.  *Id.*  Yet, plaintiff was noted to have no deformity of the spine or

---

[5]**Error! Main Document Only.**Oxaprozin is a nonsteroidal anti-inflammatory indicated for management of the signs and symptoms of osteoarthritis and rheumatoid arthritis.  *See Phys. Desk Ref.* 2730–31 (52d ed. 1998).

tenderness, with a full range of motion, flexion, extension, and rotation, with the exception of limited lateral right flexion. (Tr. 174) Kamel Madaraty, M.D., noted that plaintiff's straight leg raise test was negative for abnormalities, and he had no neuro-deficiencies. *Id.* Moreover, plaintiff told Dr. Madaraty that "the med[ications] he takes for pain help him." (Tr. 208) As treatment, Dr. Madaraty prescribed only nonsteroidal anti-inflammatory drugs and bed rest. *Id.*

On June 14, 2005, plaintiff reported to the emergency room with recurrent lower back pain that "radiated to his right leg for the last few days." (Tr. 169) Plaintiff's pained worsened with sitting up, standing, and generalized movement. (Tr. 171) He complained that the Motrin and Flexeril he had been taking were not alleviating his symptoms. *Id.* Plaintiff was given 50 mg of Demerol and 25 mg of Vistaril (Hydroxyzine)[6] at the emergency room. (Tr. 169)

On June 17, 2005, plaintiff was again seen at a walk-in clinic, complaining of back pain. (Tr. 164) He stated that lying down decreases his pain, but he also said that the pain medication—including Tylenol #3 (acetaminophen plus codeine)—he was taking effectively alleviated his pain. *Id.* He declined surgical intervention, requesting physical therapy instead. *Id.* Plaintiff was then transferred to the emergency room for a neurological consult after he complained of numbness in his right leg and foot for the past three days, a condition which had occurred before intermittently and resolved. (Tr. 165–66) However, instead of remaining in the emergency room for his examination and an MRI, plaintiff left. *Id.*

---

[6] "Hydroxyzine is used to relieve the itching caused by allergies and to control the nausea and vomiting caused by various conditions, including motion sickness. It is also used for anxiety and to treat the symptoms of alcohol withdrawal." http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682866.html (last visited July 7, 2015).

On June 29, 2005, plaintiff visited the emergency room, where he "didn't stay long and went home." (Tr. 160) It was noted that he "doesn't have any numbness or weakness in [his] right [leg]." (Tr. 161) He was experiencing "mild bac[k] pain," but the pain was "well controlled with Ibuprofen." (Tr. 196) He had no signs of neurologic compression. *Id.* It was also noted that plaintiff "has rejected surgery offered by [the] neurosurgery service." (Tr. 162) Plaintiff was noted to have mild point tenderness at the L5-S1 joint of the back, a positive result on his right straight leg raise test, but no swelling as well as normal motor strength and sensation in his legs. (Tr. 195)

Christopher Graviss, M.D., performed an MRI on plaintiff's back on August 3, 2005. Dr. Graviss noted the following: "Posterior right disc herniation with extruded fragment at L5-S1. Disc fragment impinges on both exiting and transiting nerve roots on the right side at this level. No disc herniation at any other level. No spinal canal stenosis at any level. Normal signal bone marrow. Decreased signal in the L4-L5 and L5-S1 discs. Disc space narrowing [at] L5-S1." (Tr. 145) The doctor's conclusion was that plaintiff suffers from "posterior right disc herniation with extruded fragment at L5-S1." (Tr. 145)

Also on August 3, 2005, plaintiff was evaluated by physical therapist Mark Schade. (Tr. 158) Schade recorded plaintiff's complaint of back pain for the preceding fourteen years, "with periods of minimal pain." (Tr. 158) The therapist noted no deficits in plaintiff's gait. (Tr. 158) Plaintiff had moderate tenderness in the L4-S1 region of his spine, but he was able to bend his back within normal limits in every regard, experiencing pain at the end range of motion only when he bent backwards. *Id.* His straight leg raise examination was negative for neural tension.

*Id.* Schade prescribed exercises to alleviate plaintiff's pain. *Id.* The physical therapist also noted that plaintiff had been seen for consults four times for back pain since 2001, but plaintiff "reports he is able to manage his back pain by doing stretching exercise given to him by [a physical therapist] previously." (Tr. 160)

Dr. Gina Michael examined plaintiff on August 4, 2005. (Tr. 163) According to Dr. Gina, plaintiff recalled that "he saw Dr. Crafts/Neurosurgery in 2003 and was offered surgery. He did not and does not want surgery and does not want another referral to [neurosurgery]." (Tr. 163)

Dr. Rajeshk Bhalodia's provider notes from November 16, 2005, show that plaintiff was complaining of lumbago, which is lower back pain. (Tr. 147) However, notes from that visit record that plaintiff "doesn't have any numbness or weakness in [his legs]; [he] denies any back pain, tingling, [or] numbness in [his legs]." (Tr. 152) A physical examination was performed, and it was noted that plaintiff had "mild point tenderness at L5-S1, [but] negative [straight leg raise] on right and negative on left leg." *Id.* It was also noted that plaintiff had "no swelling, normal motor strength, [and] normal sensation" in his legs. *Id.*

Dr. Bhalodia wrote that, plaintiff "rejected surgery offered by neurosurgery service," and that plaintiff had "no signs of neurologic compression." (Tr. 153) In fact, plaintiff's pain was "well controlled with [prescription] Ibuprofen." *Id.* Dr. Mona Bahl noted that plaintiff had no signs of atrophy upon examination. *Id.* His straight leg raise was negative for any abnormalities, his disc herniation was asymptomatic, and plaintiff's gait was within normal limits. (Tr. 154) Previous visits to other physicians in May, June, and August 2005, and in August of 2004,

showed plaintiff received treatment for the same problem, and he was advised to engage in therapeutic exercises and activities for the condition. (Tr. 148)

## 2. **Post-Application Records**

Sherry Bassi, Ph.D., performed a psychiatric evaluation of plaintiff on July 27, 2006, only the physical results of which are relevant to plaintiff's allegations of error. (Tr. 212–24). Dr. Bassi noted that plaintiff had a primary diagnosis of "disorders of [the] back (discogenic [and] degenerative)," and a secondary diagnosis of "affective (mood) disorders." (Tr. 38) However, Dr. Bassi found that plaintiff had no medically determinable impairment. (Tr. 212) Dr. Bassi wrote that plaintiff's complaints, as well as those by Wade, are "not credible as they are not supported by the medical evidence." (Tr. 224)

Angela Bennett, a counselor at the VA Medical Center, saw plaintiff on July 27, 2006, and wrote that, "I do not see a medically determinable impairment." (Tr. 121) Bennett made the following recommendations: "The claimant has a medically determinable impairment of degenerative disc disease in L5-S1 but has refused surgery at this time. Rejected surgery on 11/05 office visit and showed no signs of neuro compression. The claimant's physical impairment is non-severe. . . . The claimant has a non-severe physical impairment and the claimant's allegations of mental limitations are unfounded as there is no psychologically determinable impairment documented in the medical evidence. A denial for non-severe is recommended." (Tr. 40)

Plaintiff was again seen at the emergency room on August 28, 2006, complaining of knee pain, for which he was given 60 mg of Toradol[7] until an x-ray could be taken. (Tr. 243–44) X-rays of plaintiff's right knee were taken the next day. (Tr. 227–28) The x-rays revealed "no evidence of fracture, dislocation, or bony destruction." (Tr. 227) "The joint spaces [were] within the limits of normal." *Id.* X-rays of plaintiff's right knee taken on September 17, 2006, revealed that plaintiff had a small joint effusion, a moderate area of bone marrow edema of the lateral femoral condyle, and a small, stable vertical tear posterior to the horn of the lateral meniscus. (Tr.226- 227)

On September 5, 2006, plaintiff was given a hinged right knee brace. (Tr. 240) Plaintiff was seen for a follow-up of his MRI results on September 28, 2006. (Tr. 236) It "was explained that it is unlikely surgical intervention would [alleviate] his pain. He was told [that] since he is less [symptomatic] with Naproxen," his treatment with that medication would be continued. *Id.* Further follow-up appointments were not needed. *Id.*

Plaintiff presented at a primary care outpatient clinic on October 18, 2006, for a follow-up appointment. (Tr. 232–33) At that time, plaintiff "den[ied] any knee pain, back pain, tingling, [or] numbness in [his legs]." (Tr. 233) A physical examination noted mild point tenderness at L5-S1, but no abnormalities in his straight leg raises, with no swelling and normal sensation in both legs. *Id.* His pain was well controlled and he had no signs of neurologic compression. *Id.* Dr. Michael

---

[7]**Error! Main Document Only.**Toradol is "a trademark for preparation of ketorolac tromethamine," which is "a nonsteroidal anti-inflammatory drug administered intramuscularly, intravenously, or orally for short-term management of pain[.]" *See Dorland's Illustrated Med. Dict.* 1966, 998 (31st ed. 2007).

noted that plaintiff's knee pain was "currently under control on Naprosyn." (Tr. 234)

On February 28, 2007, plaintiff was seen by Dr. Carrie Fitzgibbons. (Tr. 229) Dr. Fitzgibbons noted that, "surgery was not recommended" for plaintiff's lateral meniscus tear and plaintiff was instead prescribed 500 mg doses of Naproxen for pain relief. *Id.* According to Dr. Fitzgibbons, plaintiff "state[d] that the pain has been well-controlled by the Ibuprofen," which he had just run out of two days before. *Id.* The doctor noted no tenderness or laxity in plaintiff's knee; he was told to refill his prescription medication to control his pain. *Id.* On May 2, 2007, plaintiff again saw Dr. Bhalodia. (Tr. 246) Plaintiff's pain was well controlled, and he "denie[d] any knee pain, back pain, tingling, [or] numbness in [his legs]." *Id.*

Plaintiff was seen for back pain on November 14, 2007, at which point he was again prescribed Flexeril and was scheduled for a follow-up appointment to determine if the new medication would alleviate his pain. (Tr. 255) At the follow-up appointment on January 23, 2008, plaintiff was seen by Robert Russell, M.D. (Tr. 252) He reported "improved lower back pain and knee pain on the Naproxen and F[l]exeril." *Id.* Plaintiff "denie[d] any other complaints," and he "denie[d] knee pain." *Id.* Dr. Russell advised plaintiff to continue taking Naproxen and Flexeril, and he was noted to have no pain when performing a straight leg raise. (Tr. 253) His right knee pain was "stable" and there was "no need for further intervention." *Id.*

Plaintiff was seen at a chiropractic clinic on February 22, 2008. (Tr. 519) He had decreased motion in the L4-L5 area, with no tenderness in any of his joints. (Tr. 520) Dr. Russell examined plaintiff on April 30, 2008, at which time he noted

that plaintiff was to schedule physical therapy.  (Tr. 517)  Dr. Russell also ordered a knee brace for plaintiff.  *Id.*  Plaintiff was seen by Dr. Bahl on July 24, 2008.  (Tr. 514)  At that time, Dr. Bahl encouraged plaintiff to wear his leg brace and to attend physical therapy.  (Tr. 513–14)  On April 30, 2008, plaintiff received a new right knee brace.  (Tr. 435–36)

On August 6, 2008, plaintiff was seen for a routine examination, at which time he reported only taking his daily Naproxen prescription one to two times per week.  (Tr. 506)  He had also not attended physical therapy for some time.  *Id.* Plaintiff was still consuming alcohol at that point, so he was advised to discontinue Naproxen while he was still drinking, because of possible medication interactions. (Tr. 507)

Dr. Ajit Babu examined plaintiff on April 1, 2009.  (Tr. 492)  Plaintiff told Dr. Babu that "he still has back stiffness and hears popping in his [left] knee—but overall not too limited, [and he] can walk a long distance and go upstairs ok."  *Id.* Plaintiff reported that he was taking his Naproxen and Flexeril.  *Id.*

On September 29, 2009, plaintiff was seen for an ongoing rash by Dr. Nishant Kumar.  (Tr. 490)  Dr. Kumar noted that plaintiff's back pain symptoms were "stable and controlled adequately on Flexeril."  (Tr. 487)  Dr. Kumar noted no joint swelling or decreased range of motion, no numbness or neurological signs. (Tr. 488)  Though plaintiff had popping of his left knee, there was no "clunking, grinding, giving out, catching, or other acute instability of the joint."  *Id.*  Dr. Kumar recorded that plaintiff experienced "mild pain during" range of motion exercise of the knees, and his right side straight leg raise test was "minimally positive at best."  (Tr. 489)

Plaintiff was again seen by Dr. Russell on October 14, 2009. (Tr. 484) At that time, plaintiff was no longer taking Naproxen, but he continued to take Flexeril. *Id.* On December 19, 2009, plaintiff was seen for a rash. (Tr. 482) During that examination, Dr. Ian Hornstra noted that plaintiff was still taking Flexeril. *Id.*

On July 22, 2010, plaintiff was seen for another rash by Dr. Christina Paruthi. (Tr. 468) Dr. Paruthi noted that plaintiff reported his back pain was poorly controlled on Tylenol alone, and he had "decreased [his] use of Cyclobenzaprine due to sleep inducing side effects." *Id.* Plaintiff was offered additional physical therapy for his back condition, but he refused treatment. (Tr. 469)

On October 20, 2010, plaintiff was examined again by Dr. Paruthi. (Tr. 465) According to Dr. Paruthi, plaintiff complained of waking up with chronic low back pain and left leg weakness, which "numbness is relieved after rubbing the affected area for [two] minutes." (Tr. 464) In addition, he "denie[d] any pain or tingling associated with numbness" and "denie[d] numbness with prolonged periods of standing or walking." *Id.* At that time, plaintiff was not regularly taking his Naproxen prescription; he was advised to begin taking the medication. (Tr. 465) On November 22, 2010, plaintiff said during a psychological consultation that he had last worked as a janitor in 2006, when he was "fired because he was unable to keep up with the work demand." (Tr. 462)

On April 18, 2011, plaintiff reported that he was living with the mother of his son, not his own mother. (Tr. 414) On April 26, 2011, plaintiff reported that he had last worked in 2003 or 2004. (Tr. 445) He told Dr. Vivek Agnihotri that, "his job was cleaning empty apartment complexes. He had had that job for 'a year or

two' and was fired due to not cleaning things up to standards." *Id.* After plaintiff complained of continuing back pain on April 27, 2011, he requested a renewed prescription for Cyclobenzaprine, which was issued to him. (Tr. 439) He was noted to have negative straight leg raise test results, and his back pain condition was noted to be within normal limits. (Tr. 440) He was also given a renewed prescription for Naproxen. *Id.*

### III. The ALJ's Decision

In the decision issued on July 21, 2011, the ALJ made the following findings:

1. Plaintiff meets the insured status requirements of the Social Security Act through September 30, 2006.

2. Plaintiff has not engaged in substantial gainful activity since January 31, 2005, the alleged onset date.

3. Plaintiff has the following severe impairments: (1) degenerative disc disease of the lumbar spine, and (2) the residual effects of a right knee injury.

4. Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Plaintiff has the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), where he can lift and carry as much as 20 pounds occasionally and 10 pounds frequently, so long as he has the option to alternate his position at will between sitting and standing; he cannot climb ladders, ropes, or scaffolds; he should avoid concentrated exposure to vibration and unprotected heights; and he can occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs.

6. Plaintiff is incapable of performing any past relevant work.

7. Plaintiff was born on August 13, 1970 and was 34 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date.

8. Plaintiff has at least a high school education and is able to communicate in English.

9.	Transferability of job skills is not material to the determination of disability because plaintiff's past relevant work is unskilled.

10.	Considering plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that plaintiff can perform.

11.	Plaintiff has not been disabled within the meaning of the Social Security Act from January 31, 2005, through the date of the ALJ's decision.

12.	Plaintiff's substance abuse is not a factor material to a determination that he is disabled because he is not disabled.

(Tr. 261–75).

## IV.	Legal Standards

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." *Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002) (quoting *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D),

(d)(1)(A); *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. *See* 20 C.F.R. § 404.1520; *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." *Lacroix v. Barnhart*, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. *Pate-Fires*, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. *Id.*

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. ' 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." *Moore*, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007); *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the

ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." *Buckner*, 646 F.3d at 558 (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" *Id.* (quoting *Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000); *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether the claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. *Moore*, 572 F.3d at 523; *accord Dukes v. Barnhart*, 436 F.3d 923, 928 (8th Cir. 2006); *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within

the national economy.  *Banks v. Massanari*, 258 F.3d 820, 824 (8th Cir. 2001);  *see also* 20 C.F.R. § 404.1520(f).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V.    Discussion

To be entitled to disability benefits under Title II, plaintiff has the burden of showing he was disabled prior to September 30, 2006, the date he was last insured.  *Jenkins v. Colvin*, No. 2:12-CV-91-JAR, 2014 WL 1259771, at *2 (E.D. Mo. Mar. 26, 2014); *see also* 20 C.F.R. § 404.130; *Moore*, 572 F.3d at 522; *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006).  "Evidence from outside the insured period can be used in 'helping to elucidate a medical condition during the time for which benefits might be rewarded.'"  *Cox*, 471 F.3d at 907 (quoting *Pyland v. Apfel*, 149 F.3d 873, 876 (8th Cir. 1998)).  However, to be entitled to Title II benefits, plaintiff must prove he was disabled before his insurance expired.  *Id.*

Plaintiff contends that the ALJ erred when he determined that plaintiff has the RFC to perform light work, with some restrictions.  He also contends that the ALJ's hypothetical question to the vocational expert was improper and, as a result, the vocational expert's does not constitute substantial evidence.

## A. Residual Functional Capacity

Plaintiff alleges that the ALJ committed three errors that undermine his determination that plaintiff has the RFC to perform light work, with some restrictions:  (1) the ALJ failed to cite "some" medical evidence to support his RFC determination;  (2) the ALJ failed to consider the VA's determination that plaintiff

was disabled in assessing his RFC; and (3) the ALJ improperly discounted the third-party opinion of plaintiff's aunt when he determined plaintiff's RFC.

A claimant's RFC is "the most a claimant can still do despite his or her physical or mental limitations." *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011) (internal quotations, alteration, and citations omitted). "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." *Id.* (citation omitted). The ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace." *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001) (quoting *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000)). "However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." *Id.* Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946). "Because the social security disability hearing is non-adversarial, however, the ALJ's duty to develop the record exists independent of the claimant's burden in this case." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

### 1. Medical and Other Evidence Supports the RFC

Plaintiff contends the ALJ failed to cite "some" medical evidence that reasonably leads to the conclusion that plaintiff has the RFC to perform light work. "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking

or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 416.967(b). In his disability application plaintiff reported that his past relevant work as a custodian or janitor required him to walk, stand, or climb for up to seven hours per day. (Tr. 92) In addition, he was required to lift cleaning equipment, including carrying vacuum cleaners, old carpets, mattresses, and other items "up and down 3 to 4 flights of stairs." *Id.* Plaintiff would sometimes lift up to fifty pounds as a janitor, and he frequently was required to lift up to ten pounds. *Id.* Thus, the record before the ALJ was uncontested that plaintiff had once been capable of performing, and he did perform, light work. The ALJ then considered the existence and severity of plaintiff's symptoms to determine whether he was presently capable of such performance, ultimately concluding that plaintiff can still perform light work, with the restrictions noted above. (Tr. 269–73)

To reach his conclusion that plaintiff can perform light work, the ALJ first found that plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms. (Tr. 271) Plaintiff alleges no error with that determination. Second, however, in evaluating the intensity, persistence, and limiting effects of plaintiff's symptoms, the ALJ found that after taking those factors into account, plaintiff could still perform light work. *Id.* Plaintiff alleges the ALJ erred in evaluating the limiting effects of his symptoms, claiming the ALJ did not cite any medical evidence to support his conclusion that plaintiff has the RFC to perform light work. *But see Lauer*, 245 F.3d at 704 (holding that "the burden of persuasion to prove disability and demonstrate RFC remains on the claimant").

Plaintiff wholly ignores the ALJ's analysis, which cites substantial medical and other evidence to support the conclusion that plaintiff can perform light work with the noted restrictions. In *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), the Eighth Circuit set forth factors an ALJ must consider in evaluating the credibility of a plaintiff's testimony and complaints, in addition to the objective medical evidence. These factors include:

> (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.

*Moore*, 572 F.3d at 524 (citing *Polaski*, 739 F.2d at 1322). Moreover, a claimant's subjective complaints may be discounted if there are inconsistencies in the record as a whole. 20 C.F.R. §§ 404.1529, 416.929; *McKinney v. Apfel*, 228 F.3d 860, 864 (8th Cir. 2000); *Polaski*, 739 F.2d at 1322; *see Smith v. Colvin*, 756 F.3d 621, 625 (8th Cir. 2014) (explaining that a court is to "defer to the ALJ's evaluation of [a claimant's] credibility, provided that such determination is supported by good reasons and substantial evidence, even if every factor is not discussed in depth" (internal quotation marks and citation omitted)).

Contrary to plaintiff's assertion, the ALJ considered, *inter alia*, the following medical and other evidence to determine that plaintiff is capable of performing light work: First, as the ALJ explained, "there is no medical opinion that [plaintiff] is not able to work or that sets specific limitations" on his abilities. (Tr. 272) For that reason, among others, the ALJ found that "[t]here is no credible evidence that he could not sustain" light work with some restrictions. *Id.* Where a plaintiff's medical records show a lack of significant restrictions imposed by treating physicians, such

evidence supports an ALJ's finding of no disability. *See Choate v. Barnhart*, 457 F.3d 865, 870 (8th Cir. 2006); *Brown v. Chater*, 87 F.3d 963, 965 (8th Cir. 1996); *see also* 20 C.F.R. §§ 404.1530, 416.930 ("If you do not follow the prescribed treatment without a good reason, we will not find you disabled . . . .").

As the ALJ also explained, notes from a primary care clinic visit on October 20, 2011, indicated plaintiff's lower back symptoms were not persistent. Plaintiff reported that he woke up with weakness and numbness in his left leg, but the problem subsided if he rubbed the affected area for a few minutes. He also denied any pain or tingling associated with the numbness, and he denied numbness after prolonged periods of standing or walking, ultimately opting to continue his medication rather than seeking more aggressive treatment. An ALJ may consider a plaintiff's conservative course of treatment as indicative that his symptoms are not disabling. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001).

On September 29, 2009, plaintiff's physical examination was generally unremarkable. Plaintiff complained that he was no longer able to run, his left knee would pop, and he had morning stiffness and mild pain during his range of motion test. But the ALJ noted that plaintiff's back and knee pain was well controlled on Flexeril. "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." *Wildman v. Astrue*, 596 F.3d 959, 965 (8th Cir. 2010) (quotation marks and citation omitted).

At an April 1, 2009, clinic visit, plaintiff complained of back stiffness and popping in his left knee, but he was able to walk long distances and ascend stairs, albeit with some difficulty. Before that, on November 17, 2007, plaintiff had also complained that his pain intensifies with long periods of sitting and standing. But

on February 22, 2008, plaintiff's lumbar range of motion was "full with no pain." (Tr. 268) He had no motor loss, sensory loss, muscle weakness, muscle atrophy, or reflex loss, and he could "toe walk and heel walk without pain." *Id.* Though plaintiff had some localized back pain and some of his muscles were hypertonic, which slightly decreased their rotational range, the medical professionals who evaluated him prescribed only ice for pain relief and continued use of his medications. *See Wildman*, 596 F.3d at 965. Moreover, as the ALJ also noted, on April 30 and July 23, 2008, plaintiff had no pain during a straight leg raise test, and he had no signs of neurologic compression on May 2, 2007.

The ALJ properly took account of plaintiff's alleged knee limitations, but he explained that plaintiff's knee condition was not disabling because "his knees are stable and he is able to walk long distances and go up and down stairs without difficulty." (Tr. 271) The ALJ also noted that plaintiff "does not use a crutch or cane, [he] only occasionally wears his knee brace[,] and [he] is able to walk effectively." (Tr. 268, 271) As *Wildman* instructs, "[i]f an impairment can be controlled by treatment or medication, it cannot be considered disabling." 596 F.3d at 965 (quotation marks and citation omitted). Moreover, the ALJ was permitted to consider plaintiff's conservative course of treatment as indicative that his knee symptoms are not disabling. *Gowell*, 242 F.3d at 796.

Furthermore, as the records from an August 6, 2008, clinic visit show, plaintiff admitted that he does not take his medications as prescribed, nor does he follow through with referrals to physical therapy. *See Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005) ("A failure to follow a recommended course of treatment also weighs against a claimant's credibility."). The ALJ also took note

that plaintiff was repeatedly offered surgery on his right knee, but he refused any surgery.  *See id.*  So too, plaintiff "declined spinal surgery, preferring to focus upon physical therapy[,] and he did not follow through with physical therapy or chiropractic treatment."  (Tr. 272)  The ALJ was permitted to consider plaintiff's failure to follow the recommended course of treatment for his back and knee conditions as indicative that his conditions are not disabling.  *See Guilliams*, 393 F.3d at 802; *see also Wildman v. Astrue*, 596 F.3d at 965; *Gowell*, 242 F.3d at 796; 20 C.F.R. §§ 404.1530, 416.930.

The ALJ additionally explained that plaintiff was inconsistent when he sometimes reported that his medications control his pain, while at other times he reported the medications provide no relief at all.  Plaintiff also failed to provide any indication of how well his electrical stimulation therapy equipment functioned.  And the ALJ found that the evidence "strongly suggests that he has not followed through with his exercises."  (Tr. 268)  The ALJ could discount plaintiff's subjective complaints where the record as a whole reflects a history of infrequent or inconsistent medical treatment.  *See Johnson*, 240 F.3d at 1148; *Clark v. Chater*, 75 F.3d 414, 417 (8th Cir. 1996).

According to the ALJ, the records were "silent with respect to any difficulties in the [plaintiff's] activities of daily living."  (Tr. 267)  While the extent of daily living activities does not alone show an ability to work, such activities may be considered along with other evidence when evaluating a claimant's credibility.  *See Carlock v. Sullivan*, 902 F.2d 1342, 1343 (8th Cir. 1990); *see also McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011) (affirming an ALJ who appropriately considered a claimant's activities of daily living).

Furthermore, the ALJ explained that, though plaintiff contends he cannot work because he is disabled, at one point he asserted that he "stopped working because he was not allowed to continue [his job] after he qualified for his VA pension benefits." (Tr. 271) The ALJ did not err when he discredited plaintiff's complaints based in part on those inconsistent statements. *See Johnson*, 240 F.3d at 1148.

The ALJ additionally noted that even though plaintiff suffered his back injury in 1992, he continued to work off-and-on until 2005 with that injury. The ALJ explained that: "The record reveals that his allegedly disabling low back condition was present at approximately the same level of severity prior to the alleged onset of disability date. The fact that this impairment did not prevent him from working at that time strongly suggests that it would not currently prevent work." (Tr. 271) According to the ALJ, "[b]ecause [plaintiff] worked for a significant time with the low back condition and symptoms that he alleges prevent him from sustaining substantial gainful work activity, unless there [are] objective findings or clinical evidence of significant deterioration resulting in additional functional limitations, those impairments and symptoms and limitations attributable to these impairments do not establish that the claimant is currently disabled." *Id.* The ALJ was correct; if a plaintiff has worked with a particular impairment for years, that impairment cannot be considered presently disabling without "evidence of significant deterioration in [his] condition." *Goff*, 421 F.3d at 792.

In assessing plaintiff's credibility, the ALJ further explained that though he did not completely disregard plaintiff's subjective complaints of pain, he did not accord those subjective complaints "much weight[,] because the alleged level of

impairment is inconsistent with the preponderance of the evidence as a whole."
(Tr. 272)  An ALJ may find that a plaintiff's "subjective complaints are not credible
in light of objective medical evidence to the contrary."  *Gonzales v. Barnhart*, 465
F.3d 890, 895 (8th Cir. 2006) (quotation marks and citation omitted); *see also*
*Gregg v. Barnhart*, 354 F.3d 710, 713 (8th Cir. 2003) ("If an ALJ explicitly
discredits the claimant's testimony and gives good reasons for doing so, we will
normally defer to the ALJ's credibility determination."); *Eichelberger v. Barnhart*,
390 F.3d 584, 590 (8th Cir. 2004) ("We will not substitute our opinion for that of
the ALJ, who is in a better position to assess credibility.").

The ALJ specifically found that plaintiff's "work history is characterized by
relatively low earning and significant breaks in employment, which cast doubts on
his credibility that he is not working because he is disabled.  His inconsistent and
poor work history may indicate a lack of motivation to work rather than a lack of
ability to work."  (Tr. 271)  The ALJ was entitled to discredit plaintiff's credibility
where he has a "sporadic [pre-alleged-onset] work record reflecting low earnings
and multiple years with no reported earnings."  *Frederickson v. Barnhart*, 359 F.3d
972, 976 (8th Cir. 2004).  So too, the ALJ could find that plaintiff was less credible
where his "incentive to work might be inhibited by [his] long-term disability check."
*Eichelberger*, 390 F.3d at 590.

The ALJ also explained that, with regard to counsel's assertion that plaintiff
might need to lie down during the day and would therefore be precluded from
working, he "did not find . . . that [plaintiff] would need to lie down during the day
for symptom relief."  (Tr. 274)  Because the evidence does not support the
assertion that plaintiff must lie down for symptom relief, the ALJ need not have

adopted counsel's proposed limitation when he determined plaintiff's RFC.  *See Gregg*, 354 F.3d at 713.

Additional evidence not explicitly mentioned by the ALJ also supports the RFC determination, such as the fact that plaintiff was inconsistent when reporting how frequently he took his medication, or which medications he had been prescribed. The ALJ considered "the entire record."  (Tr. 269)  To the extent the ALJ did not discuss certain records in detail, plaintiff has not pointed to any record that was not explicitly mentioned in the opinion that would have detracted from the RFC determination.  *See Morrison v. Apfel*, 146 F.3d 625, 628 (8th Cir. 1998) (explaining that an ALJ is not required to discuss in detail every item of evidence).

Finally, to the extent that the ALJ's consideration of any of the medical evidence was error, it did not result in an erroneous RFC determination, given the substantial medical and other evidence that supports the RFC.  Any such error was thus harmless.  *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." (citations omitted)).  For all of those reasons, the ALJ did not err in his assessment of the medical and other evidence, so his determination that plaintiff has the RFC to perform light work with some restrictions was not error.

## 2. **VA Benefits**

Plaintiff next contends that the ALJ's assessment of his RFC was erroneous because, in his view, the ALJ merely recited, rather than seriously considered, that plaintiff is receiving non-service connected disability benefits from the VA.  First, as plaintiff admits, "a disability determination by the Veterans Administration is not binding on the ALJ."  *Jenkins v. Chater*, 76 F.3d 231, 233 (8th Cir. 1996) (citing

*Fisher v. Shalala*, 41 F.3d 1261, 1262 (8th Cir. 1994), and 20 C.F.R. § 404.1504).

The ALJ was not required to give controlling weight to the VA's assessment of plaintiff's capabilities, thus his failure to do so was not error.

Second, plaintiff is correct that "findings of disability by other federal agencies, even though they are not binding on an ALJ, are entitled to some weight and must be considered in the ALJ's decision." *Morrison*, 146 F.3d at 628. But here the ALJ did just that; he did much more than merely recite the fact that the VA granted plaintiff benefits under its regulations. The ALJ referenced medical records generated by physicians employed by or working on behalf of the VA, from whom plaintiff sought treatment, throughout his opinion and particularly when discussing plaintiff's RFC. (Tr. 269–73) The ALJ also considered that plaintiff experienced the same chronic symptoms both before and after he was awarded VA benefits, and the ALJ found plaintiff's subjective complaints of disabling pain less credible in part on that basis. (Tr. 272)

Also of note to the ALJ was plaintiff's assertion that he stopped working because he was forbidden from continuing to work after he qualified for VA benefits if he wished to continue those benefits, which detracted from plaintiff's assertion that his pain prevents him from working. (Tr. 271) Unlike in *Morrison*, moreover, no medical evidence from a VA physician (or other sources) indicates that plaintiff is unable to obtain and maintain gainful employment. *Cf.* 20 C.F.R. § 404.1527(d) (explaining that a mere statement by an outside source that a claimant is "disabled" will not be given "any special significance" because such issues are "reserved to the Commissioner"). Accordingly, the ALJ properly took into account

the VA's determination when he concluded that plaintiff has the RFC to perform light work.

### 3. <u>The Third-Party Assessment</u>

Finally, plaintiff asserts that the ALJ erred when he afforded no weight to the third-party function report of Brenda Wade, plaintiff's aunt. Though Wade documented her lay evaluation supporting plaintiff's claims, she admitted that, "we don't do anything together." (Tr. 112) An ALJ may properly discount the "[c]orroborating testimony" of a person who has "a financial interest in the outcome of the case." *Choate*, 457 F.3d at 872. An ALJ is also permitted to discount opinions, even those by treating physicians, where such opinions are inconsistent with other substantial evidence in the record. *See Cline v. Colvin*, 771 F.3d 1098, 1103 (8th Cir. 2014). Here, the ALJ explained that he gave no weight to Wade's report because she is not an acceptable medical source, she has an interest in seeing plaintiff obtain additional benefits to "alleviate the burden [plaintiff] is on his parents," and she admitted that she spends little or no time around plaintiff. (Tr. 272) The ALJ's determination of plaintiff's RFC was not undermined by the fact that he accorded no weight to Wade's report.

### B. <u>Vocational Expert's Hypothetical</u>

Plaintiff also contends that the ALJ presented the vocational expert with an improper hypothetical, asserting only that the ALJ's hypothetical was formulated based on an erroneous RFC determination. "Testimony from a [vocational expert] based on a properly-phrased hypothetical question constitutes substantial evidence." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Cruze v. Chater*, 85 F.3d 1320, 1323 (8th Cir. 1996). As the Eighth Circuit has explained:

A hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ. The hypothetical question must capture the concrete consequences of the claimant's deficiencies. Likewise the ALJ may exclude any alleged impairments that [he] has properly rejected as untrue or unsubstantiated.

*Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001) (internal citations and quotations omitted); *see Heino v. Astrue*, 578 F.3d 873, 882 (8th Cir. 2009) ("[A] hypothetical question posed to a [vocational expert] need not include allegations that the ALJ found not credible." (citing *Pertuis v. Apfel*, 152 F.3d 1006, 1007 (8th Cir. 1998)).

According to plaintiff, the ALJ's hypothetical was based on a flawed RFC determination. Plaintiff reasons that, because the RFC was purportedly determined incorrectly, the vocational expert's testimony in response to the ALJ's hypothetical cannot constitute substantial evidence that other jobs exist in the national economy for a person matching plaintiff's age, education, work experience, and RFC. But as the Court has discussed, the ALJ did not err in assessing plaintiff's RFC. Therefore, the ALJ also did not err with regard to the sole point plaintiff raises on appeal of the vocational expert's testimony. The vocational expert's responses to the ALJ's properly formulated hypothetical constitute substantial evidence that other work exists for plaintiff in the national economy. *See Massanari*, 250 F.3d at 625. Accordingly, the ALJ did not err when he relied on the vocational expert's testimony.

## VI.  Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole. Therefore, plaintiff is not entitled to relief.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 19th day of August, 2015.